UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
UNITED STATES OF AMERICA,            :
                                     :
        -v-                          :    94 Cr. 134 (JSR)
                                     :
ESTEBAN GONZALEZ,                    :    MEMORANDUM
                                     :
                Defendant.           :
------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-20-10

JED S. RAKOFF, U.S.D.J.

      The Court held an initial hearing on December 2 and 4, 2009 to determine whether the sentence imposed on defendant Esteban Gonzalez by former Chief Judge Mukasey should run concurrently or consecutively (in whole or in part) to the sentence imposed on the defendant by Judge Cote in United States v. Esteban Gonzalez, 00 Cr. 447 (DLC). At that hearing, the Court concluded that a "Fatico" hearing was necessary to determine whether Gonzalez was in knowing possession of a "shank" knife discovered in a search of Gonzalez's cell at the United States Penitentiary in Canaan, Pennsylvania ("USP Canaan") on June 25, 2009, since such a determination would be material to the issue at hand. The Fatico hearing was held on December 21, 2009 and January 11, 2010, and the Court also received post-hearing submissions from the parties. The Court then issued a "bottom-line" Order on January 28, 2010, concluding that, on balance, it was more likely than not that Gonzalez did knowingly possess the shank. On the basis of that conclusion, as well as other relevant factors, the Court, on January 29, 2010, determined that Gonzalez's

sentence of 210 months should be made to run 105 months concurrent with, and 105 months consecutive to, the sentence imposed by Judge Cote.  But the Court held off filing the final judgment until it could issue the instant Memorandum setting forth the findings of fact and conclusions of law supporting the Court's conclusion that Gonzalez knowingly possessed the shank.

Based on the testimony of the witnesses and the Court's assessment of their demeanor and credibility, the Court finds the relevant facts as follows.  On June 25, 2009, Lieutenant Richard Brassard, in his capacity as Operations Lieutenant at USP Canaan -- a position he had held since March 2008, see transcript ("Tr."), 12/21/09, at 57 -- received an anonymous, handwritten "drop note" that claimed, among other things, that Gonzalez had a weapon in his cell, id. at 59.  Brassard sent four staff members to Gonzalez's cell, two of them to bring Gonzalez to Brassard's office to conduct an interview, and two to search Gonzalez's cell.  Id. at 63-65.  The search located the aforementioned shank, secured inside the flap of an accordion-style folder containing legal materials.  In his interview with Brassard, Gonzalez made no mention of the shank.

Subsequently, however, at a disciplinary hearing, Gonzalez denied that the shank was his and asserted that it had been planted in his cell.  Gonzalez hypothesized, among other things, that since he had been selling items (e.g., cookies, soda) to other prisoners, a

rival had planted the shank and then had left the note deliberately to close down Gonzalez's "store." See Post-Hearing Memorandum of the United States of America ("Gov't Mem."), Disciplinary Hearing Officer Report ("DHO Report"), Ex. A, at 1-2.

On July 21, 2009, the Bureau of Prisons' ("BOP") Disciplinary Hearing Officer ("DHO") rejected Gonzalez's arguments and concluded that Gonzalez was in knowing possession of the shank. Id. at 3. The DHO imposed a number of sanctions, including loss of good conduct time, disciplinary segregation, and loss of commissary, telephone, and visiting privileges. Id. at 4. Gonzalez also filed two informal administrative complaints, challenging the search of his room, the written incident report describing the search, and a urinalysis test to which he was subjected, and Lt. Brassard provided a response to those complaints, rejecting Gonzalez's challenges. Tr., 12/21/09, at 76-80.

At the Fatico hearing before the Court, the Government called two witnesses from USP Canaan: Correction Officer Robert Reed, who recovered the shank from Gonzalez's room and wrote the incident report, and Lieutenant Brassard. Defense counsel called three witnesses from another institution where Gonzalez had been housed, the Metropolitan Correctional Center ("MCC"): Correction Officer John Cappiello, Case Manager Nydia Ciancioso, and Lieutenant Daniel Ortiz.

3

Gonzalez did not testify.[1] The parties also submitted exhibits, including a videotape, and stipulated to certain facts and to testimony from another USP Canaan officer, Lieutenant Carl Stauffer.

The testimony from the Government's witnesses, including the stipulated testimony from Lt. Stauffer, suggests that a number of procedural errors may have been made by the USP Canaan officers who looked into this matter. For example, Lt. Stauffer's stipulated testimony established that, even though he was charged with being the "investigating lieutenant," he operated on the presumption that "anything found in an inmate's cell is automatically treated by staff as being in that inmate's possession." Tr., 1/11/10, at 3. This arguably runs afoul of BOP Program Statement 5270.07, which requires the investigating officer to "thoroughly investigate the incident . . . . record all steps and actions taken . . . and forward all relevant material to the staff" who are responsible for the disciplinary hearing. Post-Hearing Sentencing Memorandum on Behalf of Defendant Esteban Gonzalez ("Def. Mem.") at 10. The Government also conceded that the Special Investigations Unit ("SIS") at USP Canaan did not conduct an investigation, even though Lt. Brassard informed SIS of the incident. Tr., 1/11/10, at 3. These and other procedural infirmities lead the Court to conclude that it should not accord any

---

[1] Although permitted to do so by law in this context, the Court chose not to draw an adverse inference from Gonzalez's decision not to testify on his own behalf. Tr., 1/11/10, at 4; Tr., 1/29/10, at 4.

4

weight to the DHO's findings in this matter. Accordingly, the Court reaches its determination based solely on its evaluation of the evidence presented at the Fatico hearing.

That evidence, however, leads the Court to conclude, by a preponderance of the credible evidence, that Gonzalez knowingly possessed the shank knife. Gonzalez was the sole occupant of his cell, and he maintained his cell in a very organized manner. Tr., 12/21/09, at 13-14. The shank was taped inside the flap of an accordion-style folder, id. at 15-17, contained in a box of legal materials stored beneath Gonzalez's bed, id. at 53. Gonzalez's attention to detail supports the conclusion that he thus carefully hid the knife to avoid detection.

Moreover, it is unlikely that another inmate would have "planted" the shank in such an obscure spot or ever have had the opportunity to do so. Officer Reed testified that to place the weapon there, an individual would have had to pull out the box from beneath the bed, open the box, open the accordion file, secure the shank to the flap, fold the flap back over, replace the file in the box, and place the box back under the bed. Id. at 16-17, 54. Reed further testified that if he had conducted a random search, rather than the more thorough one undertaken here, he would not likely have found the shank. Id. at 17, 19-20. Hence, if an inmate intended to plant the shank, it would likely have been planted in a location where it could have been more easily found by the prison personnel.

5

To be sure, the "drop note" indicated the location of the shank, whereas, one might hypothesize, Gonzalez might have been reluctant to share this information with a fellow inmate. But the Court concludes that a fellow inmate would have had various opportunities to observe Gonzalez with the shank but few opportunities to plant it. Gonzalez's time away from his cell was reduced because he was an orderly in the housing unit, id. at 22-24, 66, and because he ran his "store" from his cell. While, as defense counsel urges, Gonzalez's unauthorized store may have provided a motive for another inmate to plant a shank, Def. Mem. at 5, the store equally provide Gonzalez with an incentive to remain close to his cell and to keep a weapon to protect his goods. Furthermore, it increased the likelihood that another individual could have seen Gonzalez removing or hiding the shank.

This is not to say that the inmate who left the "drop note" may not have been motivated by animus against Gonzalez. But the note also stated that Gonzalez had used heroin the previous week, an assertion (never proved[2]) that was completely unnecessary if the note was written by someone who had planted the shank.

As for the witnesses from the MCC called by defendant, they were largely irrelevant. Gonzalez was transported to the MCC in October 2009 for his resentencing, and while there, in November 2009,

---

[2] Based on the allegations contained in the note, Brassard ordered a urinalysis test for Gonzalez, the results of which were negative. Tr., 12/21/09, at 69-70, 105.

6

Officer Cappiello was given a drop note that indicated that a shank was located underneath the mattress in Gonzalez's cell. Tr., 12/21/09, at 139, 142. Upon searching Gonzalez's cell, Cappiello found the weapon in the middle of the mattress, where the note indicated it would be, and reported to Lt. Ortiz, who described the weapon as a plastic toothbrush with a sharpened end. Tr., 1/11/10 at 14. Gonzalez denied possessing the shank and indicated that it was planted. Moreover, Cappiello informed Ortiz that there were rumors in the unit that another inmate had placed the item under Gonzalez's mattress, although the source of the rumor or the identity of the alleged plant could not be ascertained. Id. at 11-13. Lt. Ortiz testified that he believed Gonzalez had been set up based on the crude design of the shank, the rumors on the unit, and the ease of finding it, id. at 13, 20, and therefore did not prepare an incident report or bring charges, and Cappiello agreed that the weapon was found in an "obvious" place, tr. 12/21/09 at 140-42. Case Manager Ciancioso, who was not present at the time of the search, later heard rumors about a potential plant, made inquiries of other inmates, and learned that Gonzalez had accused another inmate of cheating during a game of cards and that this individual may have planted the shank. Tr. 12/21/09, at 145-46. She testified that, during her conversation with Gonzalez, he indicated that he suspected that the inmate from the card game was responsible for the shank. Id. at 146.

In contrast with the MCC incident -- where there were rumors that Gonzalez had been set up, the shank was placed in an obvious location, and Gonzalez himself could identify individuals who may have had a motive to plant a shank -- the incident at USP Canaan lacked each and all of these elements.

The Fatico hearing also provided the Court with additional information with which to assess the defendant's character and development. In particular, Case Manager Ciancioso testified that she believed that defendant's prior violent tendencies had abated. Id. at 149-50, 152-53. To rebut that assertion, however, the Government introduced a videotape of Gonzalez assaulting another inmate, Donnell Felder, on March 26, 2008 at the United States Penitentiary in Lewisburg, Pennsylvania. The Court reviewed the two video clips in open court, id. at 154-55, the first of which shows Felder stopping in front of Gonzalez's cell and speaking directly to Gonzalez, who was inside his cell at the time, and then walking away. The second clip shows Gonzalez clearly punching Felder with such force that Felder falls immediately to the floor and remains immobile.

All the aforementioned evidence would have more than warranted the Court in making the 210-month sentence previously imposed on Gonzalez by Chief Judge Mukasey totally consecutive to the sentence imposed by Judge Cote. Nevertheless, the Court, after considering all the factors under 18 U.S.C. § 3553(a), split the

8

sentence, so that 105 months were made to run concurrent with, and 105 months consecutive to, the sentence imposed by Judge Cote. See tr., 1/29/10, at 7, 17-18.

                                                                                        _____
                                                                                   JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       April 20, 2010